CARTER, Appellant, v. OSTER et al., Respondents.

St. Louis Court of Appeals, April 14, 1908.

1. **EMPLOYER AND EMPLOYEE:** Trades Unions: Strikes. Employees may choose their employers and their working associates, and, if not working under a contract, they may leave an employment when they please for any purpose they conceive to be for their welfare, such as because a co-employee is obnoxious to them.

2. ————: ————: Keeping Another Out of Employment. But employees are answerable for keeping another out of employment when the means to do so are unlawful. Procuring the dismissal of a fellow-employee by means of strikes and extortion of penalties from his employers is illegal.

3. ————: Coercion: Damages: Mental Suffering. Where members and officers of a trades union caused another craftsman in the same business to be discharged successively from several employments by threatening strikes and by inflicting penalties and fines upon his employers, and where their conduct in such case was wilful, malicious and oppressive, accompanied with threats of personal violence such as to cause him fear and anxiety for his safety and means of earning a livelihood, they were liable in damages to him and he could recover for mental suffering as an element of damage.

4. ————: ————: ————: ————: Instruction. But in such case the jury should be instructed on the measure of damages to find the quality of the defendant's acts whether wilful and malicious.

Appeal from St. Louis City Circuit Court.—*Hon. Daniel G. Taylor,* Judge.

AFFIRMED AND REMANDED.

*Fred'k W. Imsiepen* and *John M. Dickson,* for appellant.

(1) It is a principle of law supported by a long line of authorities that where several parties have combined together for the same illegal purpose, any act done by one of them in pursuance of the original concerted plan, and with reference to the common object, is, in the contemplation of the law, the act of all, and, therefore, proof of such act will be evidence against any of the others who were engaged in the conspiracy, and. any of the others are as much responsible for such acts. to which they relate, as if made by themselves.  8 Cyc., page 649, citing: State v. Gathin, 170 Mo. 354; Clinton v. Estes, 20 Ark. 216; Solander v. People, 2 Colo. 48; New York Guarantee v. Gleason, 78 N. Y. 503; 1 Greenleaf on Evidence (1899), p. 184a; 3 Greenleaf on Evidence, sec. 94.  (2)  Injuries for mental suffering grow out of and depend upon a personal wrong done to the person, or in violation of some inalienable or personal right.  No distinction can be made between the forms or kinds of mental suffering caused by a physical injury, and mental suffering caused by an insult, vexation or willful wrong, though in the latter case no physical injury is inflicted yet follows as a consequence thereof. Sedgwick, Meas. Damages (1874), 35 note, 100 cases cited.   (3)  Either threats, duress or exhibition of superior force are the basis of recovery for wounded feelings, insult, humiliation or indignity as mental suffering.  Vorheis, Damages (1903), sec. 99, and cases cited.  Hickey v. Welch, 91 Mo. App. 14; Bigelow, Torts, sec. 58.   (4)  Exemplary damages, or smart money is allowed as a punishment to the wrong doer, on account of the bad or wicked motive, or purpose, injustice, or careless indifference of the party causing the wrong or injury.  Vorheis, Damages (1903), secs. 13, 105; Gildersleeve v. Overstolz, 90 Mo. App. 532; Wamsganz v. Wolf, 86 Mo. App. 205.  (5)  Malice may

be proved by showing that the act was done with knowledge that it would do harm, or with knowledge that it would be unjust, or in reckless or wanton disregard of another's rights. Bigelow on Torts, sec. 35; City Savage v. Brewer, 16 Pick. 453; Gott v. Pulsifer, 122 Mass. 235; Zinn v. Rice, 154 Mass. 1.

*John A. Talty* for respondents.

There can be no recovery in Missouri for mental pain and anguish, disconnected with bodily injury. Spohn v. Railway, 116 Mo. 633; Grayson v. Transit Co., 100 Mo. App. 60; Deming v. Railway, 80 Mo. App. 157. Respondents had a right to refuse to work with appellant or go back to work until satisfactory arrangements had been made to pay them for their time lost. Commonwealth v. Martin, 7 Pa. 219; People v. Davis, 57 A. L. J. 710; Thomas v. Cincinnati, 67 Fed. 819; Shoe Co. v. Saxey, 131 Mo. 222; Beck v. Ry. Teamsters Union, 116 Mich. 497; Munch v. Shankland, 69 N. Y. Supp. 349; Cook v. Dolan, 6 Pa. Dist. Rep. 523.

GOODE, J.—Plaintiff is by trade an ammonia, steam and hot water fitter, and at the dates hereafter mentioned had followed that employment for about twelve years. Defendants are alleged to be, and the proof tends to show they are, members of a trade union in the city of St. Louis denominated Local Branch No. 29 of the National Association of Steam and Hot Water Fitters of America. This association and a score or more of other trades unions connected with the building and equipment of houses, are affiliated with a larger association called the St. Louis Building Trades Council. The membership of the latter body consists of about forty representatives from each of the different trades unions of the city whose members follow crafts connected with the construction and equipment of buildings. The St. Louis Building Trades Council, as shown

by the preamble to its constitution and by-laws, is designed to control all work on, and all workmen who have anything to do with the building and repairing of houses "from the foundation to the roof." Artisans, such as carpenters, plumbers, steamfitters and others, are required by said constitution and by-laws to be members of their respective trades unions and to have a card or license from the central organization, the St. Louis Building Trades Council, in order to be recognized by the latter or by union men, or have the benefits expected to be obtained by the organization of this branch of labor. Business agents, or walking delegates, were appointed by the different unions for the performance of several duties, of which one was to ascertain when and where non-union workmen were employed by building contractors. Two of these agents or delegates who served said Local Branch No. 29 of Steam and Hot Water Fitters, were defendants John Riegert, Jr., and Henry Brammeyer, who appear prominently in the evidence as the active agents in causing the grievances of which plaintiff complains. The evidence in the record, including the constitution and by-laws of the Building Trades Council, shows that the purpose of both said Council and the subordinate unions which it dominates, was to gather into a compact and effective organization all building mechanics for mutual assistance, so as to remove injurious competition, prevent the interference of outside influence in the building business, shorten the hours of labor, protect the members of each craft against encroachments by the advance of science and invention on their ability to earn a livelihood, co-operate with other labor associations for defense against the misuse of capital, effect adjustments between employers and employees, and generally to secure improvement in the condition of artisans. Section 3 of article 6 and section 5 of article 7 of the constitution and by-laws, make plain that one purpose of the

Building Trades Council was to induce building contractors to employ as laborers only union mechanics by insuring the contractors a certain measure of immunity from strikes and by forbidding men to work on any job where work was done by non-union men, or while grievances between a union and a contractor were unsettled. When the business agents or walking delegates of Local Branch No. 29 of the Steam and Hot Water Fitters, or the agents of the Building Trades Council, discovered a non-union artisan at work on a job where union men were also employed, the agents would demand of the contractor or employer that the non-union workman be discharged, and also compel such contractor to pay a fine for having employed him; and in this way contractors were coerced into employing only union workmen. The evidence tends to show, too, that in furtherance of this aim, threats of bodily harm to non-union men and verbal abuse of them were occasionally resorted to by members of the union; and sometimes these threats were carried out; but as to how far such violent methods were endorsed by the orders or were acts of individual passion, is not conclusively shown. The foregoing is a correct statement in a general way, of the purposes and usages of the trades organizations with which the testimony deals. In December, 1903, plaintiff Carter was at work for the Missouri Heating and Construction Company at wages of $5.50 a day for eight hours work. While he was installing an ammonia plant for his said employer on Morgan street, Reigert and Brammeyer discovered him. The Missouri Heating and Construction Company had in its employ at the time union mechanics connected with said Local Branch No. 29, and Brammeyer and Reigert, walking delegates of said branch, notified Barr, the manager of the Missouri Heating and Construction Company, to discharge Carter and another non-union workman who was in the company's employ on pain of a strike by the union men. Carter

and the other workman were discharged, in consequence of this notice, on December 24th. Afterwards Reigert and Brammeyer served notice on Barr that his company had been fined $200 for employing Carter. Barr at first refused to pay the money, but the union men in the company's employ quit work forthwith and the company was compelled to pay in order to go on with its contract. After his discharge by the Missouri Heating Company and until February 29, 1904, when the present action was instituted, Carter procured work from several contractors, who, in turn, were forced by the action of Local Branch No. 29 to discharge him after he had worked a day or two; and in one or more instances fines were imposed on the contractors for employing him. His last job was on some work at the Louisiana Purchase Exposition Grounds and for a contractor by the name of Burgrobe. Burgrobe was compelled to dismiss the plaintiff by a strike of the union men, instigated by said local branch's walking delegates, and on this occasion the evidence tends to show plaintiff was menaced with an assault by union men and forced to call on the guards of the fair grounds for protection. After this he made an arrangement with a contractor by which the two were to do business on their own account and plaintiff was to get a commission for his work; but the unions prevented them from getting any business. The essence of the testimony is that plaintiff's employers were forced to discharge him in from three to five instances between December 24, 1904, and February 29, 1905, by threats of strikes and fines; that contumelious epithets were applied to him by union workmen and threats of violence, and that he was told he would not be allowed to work on jobs. It is alleged that the wrongful and coercive methods of the defendants are still in force and all employers of such labor as plaintiff performs have been terrorized into refusing to employ plaintiff, who, therefore, can obtain no work and is held

up to scorn and ridicule by defendants and other workmen. To recover for these torts to his person and interferences with his means of getting a livelihood, all alleged to have been wrongfully, maliciously and wilfully made, plaintiff prayed damages, and under the instructions of the court the jury returned a verdict in his favor for $750 actual and $250 punitive damages. The court granted a new trial on two grounds. The first was that error had been committed in the reception of evidence of an assault made by one Malloy on a non-union workman named Hoblitzell. Malloy is not a defendant, but was a member of Local Branch No. 29. Hoblitzell had worked with plaintiff for the Missouri Heating and Construction Company and was assaulted by Malloy on the street. Plaintiff was not connected with this episode and no doubt it was irrelevant and evidence about it ought to have been rejected; but in view of the abundant evidence to prove the acts for which plaintiff asks redress, the irrelevant testimony in question is hardlly ground for setting aside the verdict. The other ground on which the court sustained the motion for a new trial is, that the instruction on the measure of damages was erroneous in that it permitted plaintiff to recover, in case of a verdict for him, not only his pecuniary loss, but for mental pain and suffering due to fear, anxiety, wounded feelings and distress of mind caused by defendants' tortious acts.

1. Counsel for defendants contends no case was made for the jury and insists that we pass on the question of whether there was or not. His position is that at the utmost, whatever was done by defendants, or any of them, which caused plaintiff to lose employment, was within their lawful rights and, therefore, afforded no ground of action. Perhaps this position would be tenable if, as counsel says, the evidence showed no more than that the members of Local Branch No. 29 of Steam Fitters, acting through their delegates, caused members of that Order to cease working for contractors when

plaintiff was employed on the job. The lower court instructed the jury it was not unlawful or a conspiracy for workmen merely to combine together to quit an employment, unless an adjustment of differences between themselves and their employer was made, nor to refuse to associate or work with any man they saw fit. Many decisions, and perhaps the weight of authority, uphold the right of employees, either individually or in combination, to quit working because some fellow-servant is obnoxious to them, when they are not governed by a contract of service of definite duration. This is on the principle that employees may choose both their employer and their working associates; and it may well be that, if not under contract, they may leave an employment when they please for any purpose they conceive to be for their welfare, or likely to aid in the amelioration of the lot of the laboring classes, if their conduct is dominated by such a motive rather than by a malicious desire to injure some one else. In recognition of this principle, the right of artisans to strike for an increase of wages or for shorter hours, or because a co-employee is obnoxious to them, has been often adjudged; though perhaps it cannot be said the current of authority is unbroken in favor of the right to strike, when the immediate purpose is to cause the discharge of an obnoxious fellow-servant, even though the ultimate purpose may be the attainment of better economic and social conditions. The decisions most favorable to defendants are those which were given in Nation Protective Assn. v. Cumming, 170 N. Y. 315, 65 N. Y. Supp. 946. That cause was decided in the court of last resort by a divided bench. In a minority opinion which was concurred in by three judges out of seven, it was insisted the opinion of the majority went further in excusing acts done pursuant to a conspiracy to cause non-union workmen to be discharged from employment, than the current of authority would warrant; and, that

the decision was in conflict with the one given by the same court in Curran v. Galen, 162 N. Y. 33. All the judges concurred, in the main, regarding the propositions of law involved, but differed as to whether the defendants had been guilty of illegal conduct. Without dwelling further on the case, suffice it to say there was no proof, as there is in the present record, of the menace of personal violence to non-union workmen, or of abusive epithets being applied to them, or of personal molestation and insulting remarks while they were attending to their duties, or of the imposition of "fines" (so-called) on contractors who hired them, and which had to be paid to a Union before its members would work for the offending contractor. Hence the decision is only in point by analogy in the present appeal. The principal discrepancies among the authorities in cases like this are: (a) As to what means may lawfully be used by a collection or order of workmen to cause the discharge of other workmen; but most courts hold the means must not pass beyond persuasion and take on a coercive, violent, or punitive character. [Hamilton Brown Shoe Co. v. Saxe, 131 Mo. 212; Natl. Protect. Assn. v. Cumming, Curran v. Galen, supra; Allen v. Flood, L. R. App. Cas. (1898); Quinn v. Leathem, L. R. App. Cas. (1901), 495, explaining Allen v. Flood; Bowen v. Hall, 6 Q. B. Div. 633; Wunch v. Shankland, 69 N. Y. Supp. 349; Berry v. Donovan, 188 Mass. 353; Lucke v. Clothing Cutters Assn., 72 Md. 396; Erdman v. Mitchell, 207 Pa. St. 79; Casey v. Typo. Union, 45 Fed. 135; Old Dom. Steamship Co. v. McKenna, 30 Fed. 48; Barr v. Union, 53 N. J. Eq. 101; Eddy, Combinations, 415, 427.] (b) Whether means which would be lawful if used by an individual, become unlawful and amount to a conspiracy when used in combination. [3 Wharton, Crim. Law, sec. 2322; 1 Tiedeman, State & Fed. Cont., pp. 426, 436, incl.; 1 Eddy, Combinations, secs. 461, et seq.; Arthur v. Oaks, 63 Fed. 310; Mapstrick v. Ramge, 9 Neb. 390; Crump v. Commonwealth,

84 Va. 927, 926; Mogul Steamship Co. v. McGregor, L. R. 23 Q. B. Div. 598; State v. Donaldson, 32 N. J. L. 157.] (c) Whether acts which might lawfully be done simply to further the welfare of those who participate in them, become unlawful when inspired by a malevolent design to injure obnoxious workmen. [1 Eddy, sec. 469; Chambers v. Baldwin, 91 Ky. 121; Allen v. Flood, Bowen v. Hall, supra; Thomas v. Railroad, 62 Fed. 803, 821; Walker v. Cronin, 107 Mass. 555.]

But there can be no difference of legal opinion on one proposition; that third parties are answerable for keeping a man out of employment when the means employed to do so are unlawful; and on this proposition all the authorities agree. [Moran v. Dunphy, 177 Mass. 485; 1 Tiedeman, Stat. and Fed. Const. 440.] In the present case we have no occasion to inquire concerning the responsibility of the defendants, further than to ask if the methods resorted to by them to prevent plaintiff from obtaining and retaining employment were illegal. It was proved that as soon as he was known to have work on a job, the agents of Local Branch No. 29 would notify his employer to discharge him on pain of a strike, and would, moreover, extort from the employer a heavy fine for having hired him. The activity of the building business in St. Louis and the demand for labor, were so great contractors were coerced into dismissing Carter. If they refused to do that or to pay the fine, the union men in their service would strike, thereby preventing them from completing their contracts and threatening them with losses and perhaps ruin. A sort of duress was brought into operation which contractors were powerless to resist. In so far as Carter was kept out of work by threats of violence to his person, his case is within the statute; for interference in that manner with employment is a statutory crime. [R. S. 1899, sec. 2155.] Plaintiff was also molested by offensive remarks and abusive epithets.

Procuring plaintiff's dismissal from various employments by means of strikes and the extortion of penalties from contractors were adopted as methods of preventing him from following his trade and were, likewise, illegal. No doubt the members of the union had an economic purpose in view, namely, to unionize all building craftsmen and thereby render laborers more independent in treating with contractors and capitalists; and if it was not unlawful for the defendants simply to cause a strike in order to procure plaintiff's discharge, there is the further fact that money was extorted from those who gave him work. We have found no case on the subject wherein either the point in decision or the reasoning of the opinion, would tolerate such a method of depriving a workman of employment. [See cases supra.]

2. On some phases of the evidence we think plaintiff would be entitled to damages for mental suffering. If nothing more was established than that defendants tortiously induced breaches of his contracts of employment, thereby keeping him idle, perhaps his damages might be confined to what he would have earned if at work. This is the general rule for the measurement of damages in an action for a wrongful discharge from service. [2 Wood, Master and Servant, 246.] But as already said, the testimony conduces to show the conduct of the defendants was not only wrongful, but wilful, malicious and oppressive; and it is generally held mental suffering due to torts of that nature is an element of damages. Defendants' counsel contends there can be no award for mental suffering unconnected with a physical injury; which is true in actions for negligent wrongs and wherein the conduct of the defendants does not exhibit malice, insult or inhumanity. [Trigg v. Railroad, 74 Mo. 147.] But there are torts of which mental distress is the proximate cause and natural result, and for which damages may be assessed. Such are malicious prosecutions, slanders and wilful

traspasses to the person, either with or without phys-
ical injury; for instance, the unlawful ejection of a
passenger from a train. [Randolph v. Railroad, 18
Mo. App. 609; McGinnis v. Railroad, 21 Mo. App. 390;
Smith v. Railroad, 23 Ohio St. 10.] In the present
case plaintiff suffered a pecuniary loss in con-
sequence of defendant's acts, and if that cir-
cumstance is essential to a recovery it existed;
that is to say, if his mental suffering standing
alone, would not constitute a case for damages and
can be considered only as the concomitant of actual
or special damages. It is generally said mental
suffering cannot be taken into consideration in an ac-
tion for tortious injury to property or for a breach
of contract. [8 Am. and Eng. Ency. Law (2 Ed.), pp.
671, 672 and citations in notes; 1 Sedgwick, Damages
(8 Ed.), secs. 44, 45.] But the rule is not without
exceptions resting on the quality of the tort commit-
ted, or the nature of the contract breached. In West
and Wife v. Forrest, 22 Mo. 344, the case was one for the
beating of a negro woman—a slave of the plaintiffs.
The slave was violently whipped by a third person in
the presence of Mrs. West, and the court told the jury
that if they believed the assault was intentionally and
recklessly made, they might take into consideration,
in assessing damages, the mental suffering and wound-
ed feelings of Mrs. West; which charge was approved.
That is a case in which damages for mental suffering
were allowed in an action for injury to property be-
cause of the character of the tort. In Moyer v. Gordon,
113 Ind. 282, the action was for damages for an unlaw-
ful ejection of plaintiffs from a house, accompanied
with malicious and oppressive conduct; and it was held
damages should be assessed, not only for the inconven-
ience and expense to which the plaintiffs were put,
but for the bodily and mental suffering, the shame and
humiliation, induced by turning plaintiffs out of their
home into the street. In Fillebrown v. Hoar, 124 Mass.

580, the cause of action was similar—an illegal eviction of plaintiff and his family from demised premises. It was proved the conduct of the defendant was wilful and in gross disregard of the rights of the plaintiff. It was held the defendant was bound to compensate not only for the pecuniary loss, but for wounds inflicted on plaintiff's feelings. So it has been held a malicious and unfounded use of the process of attachment, may give ground for the award of damages for humiliation. [Pollock v. Gantt, 69 Ala. 373; City Nat'l Bank v. Jeffries, 73 Ala. 183; Byrne v. Gardiner, 33 La. Ann. 6.] We glean from the decisions and treatises that the rule is to compensate for mental suffering due to torts against property when the acts complained of were wrongful and malicious, and in actions on contracts if the breaches were of a sort which would cause mental pain as a proximate and natural result. [1 Sedgwick, Damages (8 Ed.), secs. 44, 46; Wells Fargo Ex. Co. v. Fuller, 13 Tex. Civ. App. 610; Kinball v. Holmes, 60 N. H. 163; Coffin v. Braithwaite, 8 Jur. 875; Renihan v. Wright, 125 Ind. 536; Chicago, etc., R. R. v. Flagg, 43 Ill. 364.] We have found no case in which the question was raised regarding the right to such damages for wrongfully and maliciously keeping a person out of employment. But a man's trade and the contracts by which he is employed to exercise it, are in the nature of property. He has the right to use the former and get the benefit of the latter without tortious interference. We see no reason why the rules applicable in actions for injuries to tangible property, should not be applied in the case of an active and relentless conspiracy to prevent a mechanic from earning a living. It is true the present action is neither on a contract for its breach, nor is it, strictly speaking, for an injury to property. It sounds in tort for acts done pursuant to a conspiracy to prevent the plaintiff from following his trade. There is evidence to prove the methods

Carter v. Oster.

employed to bring about this result were, as we have seen, unlawful; and, moreover, that they were continuous, wilful, malicious, oppressive and well adapted to cause plaintiff fear and anxiety about both his personal safety and his means of earning a livelihood. The evidence tended to show the defendants, or some of them, cherished a bad animus toward him. He had applied for and been refused admission to the order, though the testimony goes to show he was a competent workmen, and certainly he never was discharged for lack of skill. After his application for membership in the union had been denied, he was followed by the delegates and his contracts of employment interfered with in every instance. Several inferences might be drawn from the evidence regarding the reason why he was rejected by the union: that he was examined by its examining board and found to lack skill, or that he had not previously served an apprenticeship of five years as helper, or that the order only received applications for membership one month out of the year and he applied at the wrong time, or that an increase of the number of steamfitters in the city of St. Louis was deemed undesirable. Whatever the cause, his subsequent treatment by the Union was harsh and oppressive.

3. While we think there was evidence to justify the court in instructing the jury they might give plaintiff damages for mental suffering for the wilful and malicious acts of defendants, we think a retrial was rightly granted because the instruction on the measure of damages did not leave it to the jury to find the quality of defendants' acts. Some of the testimony tended to vindicate at least a portion of them from the charge of wilful and malicious conduct and, perhaps, from any connection with plaintiff's grievances.

The judgment is affirmed and the cause remanded. All concur.